MARY LINDSEY CORREA, NEE MARY K. LO, *v.*
WAIAKEA MILL COMPANY, LIMITED.

No. 2024.

ARGUED FEBRUARY 12, 1932.           DECIDED MARCH 10, 1932.

PERRY, C. J., PARSONS, J., AND CIRCUIT JUDGE CASE
IN PLACE OF BANKS, J., UNABLE TO ATTEND
ON ACCOUNT OF ILLNESS.

OPINION OF THE COURT BY PERRY, C. J.

Acting pursuant to the powers conferred upon him
by section 73 of the Organic Act, by chapter 30 of the
Revised Laws of Hawaii, 1915, and by the proclamation
of the President of the United States, issued June 24,
1918, for the wartime purpose of encouraging the pro-

duction of sugar, the commissioner of public lands, with the approval of the governor, on August 12, 1918, entered into a contract with the Waiakea Mill Company, an Hawaiian corporation, relating to the cultivation of sugar cane on the ahupuaa of Waiakea in the district of Hilo, Island of Hawaii, a part of the public domain, and to the harvesting of the same and the manufacture of sugar therefrom. At that time it was the purpose of the territorial government to open the whole or large parts of that ahupuaa for homesteading and provisions were contained in the contract which were intended to facilitate that homesteading policy, while at the same time continuing to the greatest extent possible the growth of cane and the manufacture of sugar. There were provisions for the withdrawal of the corporation in favor of each and every homesteader as he might come upon the land and present himself in readiness to take up the cultivation of the cane and for the just apportionment between the corporation and the incoming homesteader of the cost of the cultivation, harvesting and other necessary operations. There were further provisions giving to the corporation under certain circumstances a lien upon the cane for the moneys expended in its cultivation.

On March 14, 1919, Lot No. 1409, which was a part of the ahupuaa, was made the subject of a homesteading agreement between the Territory and one Kikuyo Fujii, and the Waiakea Mill Company was notified in due course that this homesteader was ready to take possession and to cultivate the cane. The corporation thereupon ceased cultivation. Kikuyo Fujii, however, failed to enter and to cultivate and her agreement with the Territory was subsequently cancelled. Thereupon a "Special Homestead Agreement" (No. 1859), bearing date of March 5, 1920, was entered into by the commissioner of public lands, with the approval of the governor, and Mary K. Lo, the

present plaintiff, relating to the same Lot No. 1409.

Commencing about March 8 and ending before eight o'clock on the morning of March 24, 1920, the Waiakea Mill Company harvested all of the cane then growing upon Lot 1409, transported it to its mill and in due course manufactured it into sugar and sold the sugar. On March 1, 1926, the present action by the plaintiff against the defendant was commenced. In the declaration it is alleged that the plaintiff "was the owner and entitled to the immediate possession of all and singular that certain crop of matured sugar cane standing on and being upon" Lot 1409 and that "on divers occasions and times between the 6th and 27th days of March, A. D. 1920, * * * the said defendant, without the permission and against the will of plaintiff, wilfully and unlawfully entered in and upon the above described premises * * * and then and there * * * wrongfully cut down, took and carried away a matured crop of sugar cane of great value, consisting of 254.12 tons, then being and standing upon said premises, said sugar cane being then and there the property of and in the possession of plaintiff, and converted the same into raw sugar and molasses of a value of $14,971.66, which said sugar and molasses the said defendant sold and disposed of to its own use and benefit, and converted the proceeds thereof" to its own use. The prayer was for judgment in the sum of $21,958.06. The defendant's answer was a general denial. At the first trial the jury rendered a verdict in favor of the plaintiff in the sum of $12,658.20. Upon a writ of error this court set aside the verdict and granted a new trial. (31 Haw. 317.) At the second trial the jury rendered a verdict in favor of the plaintiff in the sum of $1883.50, principal, and $1657.74, interest. Both parties were dissatisfied and each of them brings a bill of exceptions to this court.

"Special Homestead Agreement" No. 1859 is a con-

tract whereby the commissioner of public lands authorizes and empowers the homesteader (the present plaintiff) to take immediate possession of Lot No. 1409 and to occupy and use the same subject to certain covenants and conditions. By that instrument the homesteader covenants to perform certain prescribed conditions of residence, cultivation and maintenance and to pay the agreed purchase price of $2320 in certain specified installments; and the commissioner undertakes to issue a patent to the homesteader, within a stated time, upon performance by her of all of the terms on her part to be kept and performed. As above stated, the agreement on its face bears date of March 5, 1920. At the first trial both parties proceeded upon the assumption that the instrument was executed and became effective on the date which it bears. At the second trial, for the first time, the defense was presented that the agreement was not executed, and did not become effective, until business hours of March 24, 1920, that the crop of cane which was on the land on March 5, 1920, was all cut and removed by the defendant during a period beginning about March 8 and ending not later than eight o'clock on the morning of March 24, and that therefore when the agreement became effective (in business hours of March 24) it did not convey or transfer to the homesteader (the plaintiff) any right in the cane and there can be no recovery by the plaintiff in this action.

The agreement is on a printed form as to its first, third and fourth pages. The undisputed evidence is that the blanks on the first, third and fourth pages were filled in and the signature of the plaintiff appended, in Hilo, on March 5, 1920; that at the time of its execution by the plaintiff there was in the instrument no detailed description of the lot such as is now found on page two thereof and there was not attached to it the blueprint

of the map of the lot now attached thereto; that on March 5, 1920, the document as signed by Mrs. Lo was forwarded to the office of the commissioner of public lands in Honolulu; that subsequently the description was typewritten on the second page and the blueprint was attached; that on March 24, 1920, the commissioner of public lands, by letter of that date, forwarded to the acting governor of Hawaii "for your approval" the instrument in question; that subsequent to the sending of this letter, and on the same day, Acting Governor Iaukea signed the clause of consent printed at the end of the instrument and reading "I consent to the sale of the said land upon the terms and conditions above set forth;" that by letter dated March 30, 1920, the chief clerk in the office of the commissioner of public lands in Honolulu forwarded to the agent in Hilo Agreement No. 1859 "in duplicate, one copy being for your files and the other for delivery to the proper parties." The evidence is silent as to when the commissioner of public lands signed the agreement.

The Organic Act, in section 73 (c), provided that "the laws of Hawaii relating to public lands, the settlement of boundaries, and the issuance of patents on land commission awards, except as changed by this Act, shall continue in force until Congress shall otherwise provide." "Special Homestead Agreements" were specifically authorized by section 480, R. L. 1925, which was originally a part of the Laws of 1895 as amended by the Laws of 1896. That section reads: "Subject to the provisions of sections 440, 441, 450-454, the commissioner may, with the consent of the governor, sell public lands not under lease upon part credit and part cash, and deliver possession under an agreement of sale containing conditions of residence on or improvement of the premises sold, or of payment by installments or otherwise of the purchase price, or all or any of such conditions. And in case of

default in the performance of such conditions, the commissioner may, with or without legal process and without notice, demand or previous entry, take possession of the premises and thereby determine the estate created by such agreement. Which agreement shall entitle the purchaser to a land patent of the premises upon the due performance of its conditions." Sections 440 and 441 contain requirements of public auction and notice. Section 450 describes persons who are not entitled to homestead public lands. Section 451 relates to disqualifications for homestead entry. Section 452 prohibits alienation of interests in homesteads "without the written consent of the commissioner and governor" and section 453 relates to forfeitures. Section 454 is a part of section 73 (i) of the Organic Act and reads as follows: "The persons entitled to take under any such certificate, lease, or agreement" (meaning special homestead agreements) "shall be determined by drawing or lot, after such public notice as provided in section 441; and any lot not taken or taken and forfeited, or any lot or part thereof surrendered with the consent of the commissioner, which is hereby authorized, may be disposed of upon application at not less than the advertised price by any such certificate, lease, or agreement without further notice." Land patents must be "signed by the governor and countersigned by the commissioner of public lands." R. L. 1925, § 478.

By virtue of these provisions, and particularly in the light of the express requirement of section 480, the consent of the governor to a special homestead agreement was indispensable to give any such agreement force and effect. Unless and until consented to by the governor, any such attempted agreement, even though satisfactory to the commissioner and to the applicant, would be invalid and ineffective. The evidence was undisputed that the

governor did not consent before business hours of March 24, 1920, and that at that time there was no cane on Lot 1409. Whatever the respective rights of the Territory and of the Waiakea Mill Company may have been in and to the cane under those circumstances, it is clear that upon that showing the plaintiff had no right to the cane and therefore could not maintain the action. Upon the state of the evidence then before the court the defendant's request for an instruction directing a verdict in its favor should have been granted. Other requested instructions were presented by the defendant whereby the court would submit to the jury the question whether the instrument had been signed by the governor prior to March 24 and whether any of the cane remained upon the land after the governor's signature. These would have been appropriate if there had been any conflict in the evidence upon those two points.

The question has been mentioned to some extent in argument as to whether Special Homestead Agreement No. 1859 became effective upon its being filed in the office of the commissioner of public lands or became effective only after its delivery to the homesteader in Hilo. In view of the fact that no evidence was adduced tending to show on what date the fully executed agreement was recorded or filed in the office of the commissioner of public lands or tending to show the precise circumstances surrounding its recording or filing and in view of the further fact that the question of law as to whether it is the recording or the delivery of such an agreement that gives it force and effect has not been fully argued, the question is not now decided. It is sufficient for the purposes of the present appeal that the undisputed evidence, consisting largely of written documents, shows that the agreement was not approved by the governor until March 24, after all of the cane had

been cut and removed by the defendant.

At the first trial of this case one D. M. Forbes, then manager of the defendant corporation, was examined and cross-examined and gave testimony at length upon certain of the issues involved. At the second trial the defendant offered in evidence a transcript of the testimony of Mr. Forbes, taken at the first trial, on the ground that at the time of the second trial the witness was in such a condition physically as to render him unavailable. The physician in attendance upon Mr. Forbes, and one other physician as an expert, testified in support of the motion to introduce the transcript. At the conclusion of their testimony the presiding judge said: "The testimony in this case of the two doctors as it appears to me, and I do believe it, shows that David McHattie Forbes is in such ill health that to take his deposition or require his appearance in court as a witness for examination would, because of the great mental strain and excitement, cause him great physical injury, if not cause his death." The testimony given at the first trial was thereupon admitted.

This court has expressly held in *Tsuruda* v. *Farm,* 18 Haw. 434, that the testimony of a witness, given at an earlier trial of the same case, with opportunities for complete cross-examination, is admissible in a second trial if the witness is for any sufficient reason unavailable at the second trial. It said in that case: "The unavailability of a witness may result from his death, his absence from the jurisdiction, his disappearance and inability to find him, his illness, infirmity, age or official duty preventing his attendance, insanity, loss of memory, speech or sight or disqualification by infamy. The unavailability of the witness for purposes of testifying, if shown to the satisfaction of the trial court and with proper limitations to guard against collusion or surprise or the giving of undue advantage avoidable by continu-

ance, is generally sufficient in civil, if not in criminal, cases to admit evidence of his former testimony." *Ib.*, 438. It need hardly be added that not every illness will justify admission of the former testimony. When the illness is slight it may be possible to examine the witness, in the presence of court and jury, in his own home. If the illness is more serious, but nevertheless temporary, and if an adjournment of the cause to await recovery will not inflict undue hardship upon either party, such an adjournment can be had. When, however, as in the case at bar, the witness has had two premonitory, even though slight, strokes of paralysis and his physical condition is such that a third and fatal stroke is obviously probable and will almost certainly result from an examination and cross-examination, lengthy, searching and exacting, in a vigorously contested trial, the witness is unavailable within the meaning of the rule. "Any physical incapacity preventing attendance in court, except at the risk of serious pain or danger to the witness, should be a sufficient cause of unavailability; and this has been almost universally recognized by courts." 3 Wigmore Ev. (2d Ed.) § 1406. The "ability" of the witness to attend "is to be considered with reference to the risk of pain or danger to the witness." *Ib.*, § 1406. See also 1 Greenleaf Ev. (16th Ed.) §§ 163, 163 (g).

There was no error in the admission of the former testimony of Mr. Forbes.

The defendant offered in evidence a mortgage dated July 30, 1920, executed by Mary K. Lo, the plaintiff, to the defendant. The presiding judge refused to admit the mortgage in evidence on the ground that it did not refer to the crop of cane harvested in March, 1920; and which is the subject of this controversy, and was therefore irrelevant. The mortgage provided: "The borrower doth hereby grant, bargain, sell, assign and convey unto the

mortgagee, its successors and assigns—that certain Special Homestead Agreement No. 1859 from the commissioner of public lands of the said Territory and all the borrower's right, title and interest, both at law and in equity, therein and thereunder and in and to that certain tract of land, to-wit: Lot No. 1409 and House Lot No. 2, Block 502, of the Waiakea Homesteads in the district of South Hilo * * * ;

"And also the crops of sugar cane now or at any time hereafter being and growing or having been or grown on the said tract of land and the products manufactured therefrom, also the proceeds of sale of all of the said crops and/or products;

"And also all tools, implements, machines, equipment and animals belonging to the borrower and used by him for or in connection with the said land and the cultivation thereof."

The question is whether the crop of cane harvested in March, 1920, is one of "the crops of sugar cane" mentioned in paragraph 2 of the description of the mortgaged property.

Studying the grammatical construction of the paragraph, it is clear that "the products" which are mortgaged are only those which are manufactured "therefrom." It must first be ascertained what crops of cane are mortgaged before it can be ascertained what products are mortgaged. The second class of property mortgaged, to-wit, "the products manufactured therefrom," cannot add to the first class, to-wit, "the crops of cane," but is wholly dependent upon the identity of the crops of cane that are mortgaged. The same is true of "the proceeds of sale" which are mortgaged. Only those proceeds are mortgaged which came from "the said crops or products," —again making it necessary to determine first and independently what crops of cane are mortgaged. Exclud-

ing, then, the reference to the first and the second classes of property mortgaged, the particular language to be construed is "the crops of sugar cane now or at any time hereafter being and growing or having been or grown" on Lot 1409. If the description of the crops had simply been of those "now or at any time hereafter being and growing" on the land, the meaning would be entirely clear. Crops on the land at the date of the execution of the mortgage and crops thereafter on the land would be the mortgaged property. The contest is introduced solely by reason of the use of the words "or having been or grown" on the land. That apparent difficulty, however, disappears if it is borne in mind that what was mortgaged was "crops of sugar cane." Sugar cane not in existence either at the date of the mortgage or thereafter was not mortgaged. Cane which had passed out of existence at any time, long or short, before the execution of the mortgage was not mortgaged; but a crop of cane which had grown on the land and had been cut and was still lying there at the time of the execution of the mortgage would be included and so, also, would be included a crop of cane which had grown on the land and had been cut and had been removed to the mill several miles distant and was still on the cars awaiting its turn to be crushed. A reason for the inclusion of the phrase "or having been or grown" is thus seen to have existed. The words had a meaning and a possible application.

We cannot take the view that that which had ceased to be sugar cane before the execution of the mortgage could pass or was intended to pass under the description of "crops of sugar cane" or that the later addition of two classes of property, to-wit, "the products manufactured therefrom" and "the proceeds of sale of all of the said crops and/or products" could add anything to the number or the size of "the crops of sugar cane" mortgaged as a

first. class of property. The circuit judge was correct in refusing to admit the mortgage in evidence.

Brief reference will now be made to other questions presented by the exceptions and which may or may not be raised at a third trial.

The testimony of the defendant's manager, tending to show how much should be deducted from the gross weight of the cane harvested on Lot 1409 for mud, leaves and other impurities adhering to the cane, was correctly admitted. The plaintiff was entitled to recover, if at all, for the cane only, and not for the impurities.

Testimony was admissible tending to show current prices for sugar cane bought and sold under contract and this, too, in spite of the fact that, upon plaintiff's theory of the case, the cane in question was taken without right and not under contract. If the cane was taken in good faith, although wrongfully, the plaintiff was entitled to recover, as has been heretofore held in this case (31 Haw. 317, 318), the value of the cane immediately before it was cut and not the proceeds of the sugar made by the defendant therefrom. One of the most effective if not the only method of showing the value of the standing cane was to prove the price of cane in the same district or its vicinity when bought and sold by others.

The same is true of evidence, written or oral, tending to show the selling price of sugar on the New York market at or about the dates when the sugar manufactured from the cane in question was sold. There was testimony to the effect that all of those buying and selling cane in the general vicinity of Waiakea considered the New York price of sugar in determining the correct selling price of the cane.

Evidence of the expenses incurred by the defendant in cultivating and harvesting cane on Lot 1409 and on neighboring lots and allocations of those expenses to Lot

1409, testified to by defendant's witnesses, was receivable in evidence as tending to show the truth of defendant's assertion and defense that it entered and cut and removed the cane in good faith, in the belief that under its contract of August, 1918, with the Territory it had a lien for the amounts expended.

The plaintiff should have been permitted to ask the defendant's witness Nash, its chief accountant, on cross-examination, whether the defendant "kept two sets of books or memoranda, one for private information and one for the information of the homesteaders,"—this as tending to affect the credibility of witnesses on behalf of the defendant on the subject of expenditures and accounts and as bearing upon the weight properly to be given by the jury to the defendant's accounts and other written memoranda of expenditures.

Instructions to the effect that certain stated circumstances may be considered by the jury in determining questions of good faith should be so worded as to refer at the same time to the possible existence of other circumstances in the case having a contrary effect,—and so as to call the attention of the jury to the fact that its duty is to consider all of the relevant circumstances, whether they tend in one direction or in the other, before coming to a conclusion on the subject of good faith.

The verdict is set aside and a new trial is granted.

*D. E. Metzger* (*A. G. Correa* with him on the brief) for plaintiff.

*C. S. Carlsmith* and *C. W. Carlsmith* (*Carlsmith & Carlsmith* and *M. L. Carlsmith* on the briefs) for defendant.